IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SUSAN Z.,[1]                                    1:19-cv-01688-BR

              Plaintiff,                        OPINION AND ORDER

v.

Commissioner, Social
Security Administration,

              Defendant.

**JOHN E. HAAPALA, JR.**
401 E. 10th Avenue
Suite 240
Eugene, OR 97401
(541) 345-8474

              Attorneys for Plaintiff

**BILLY J. WILLIAMS**
United States Attorney
**RENATA GOWIE**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1021

---

[1] In the interest of privacy this Court uses only the first name and the initial of the last name of the nongovernmental party in this case.

1 - OPINION AND ORDER

**MICHAEL W. PILE**
Acting Regional Chief Counsel
**LISA GOLDOFTAS**
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104
(206) 615-3858

            Attorneys for Defendant

**BROWN, Senior Judge.**

    Plaintiff Susan Z. seeks judicial review of a final decision
of the Commissioner of the Social Security Administration (SSA)
in which he denied Plaintiff's application for Disability
Insurance Benefits (DIB) under Title II of the Social Security
Act.  This Court has jurisdiction to review the Commissioner's
final decision pursuant to 42 U.S.C. § 405(g).

    For the reasons that follow, the Court **AFFIRMS** the decision
of the Commissioner and **DISMISSES** this matter.


                    <u>**ADMINISTRATIVE HISTORY**</u>

    Plaintiff filed an application for DIB on January 19, 2016,
alleging a disability onset date of June 1, 2007.  Tr. 162.[1]  The
application was denied initially and on reconsideration.  At some
point after reconsideration Plaintiff amended her alleged onset
date to January 1, 2002.  Tr. 90.  An Administrative Law Judge

---

        [1] Citations to the official transcript of record filed by
the Commissioner on February 27, 2020, are referred to as "Tr."

2 - OPINION AND ORDER

(ALJ) held a hearing on June 29, 2018.  Tr. 32-66.  Plaintiff was represented at the hearing.  Plaintiff and a vocational expert (VE) testified.

The ALJ issued a decision on October 10, 2018, in which she found Plaintiff was not disabled before her June 30, 2007, date last insured and, therefore, is not entitled to benefits. Tr. 14-26.  Pursuant to 20 C.F.R. § 404.984(d), that decision became the final decision of the Commissioner on September 19, 2020, when the Appeals Council denied Plaintiff's request for review.  Tr. 1-7.  *See Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

## BACKGROUND

Plaintiff was born on November 1, 1959, and was 58 years old at the time of the hearing.  Tr. 162.  Plaintiff graduated from high school.  Tr. 36.  Plaintiff has past relevant work experience as a chef, restaurant manager, appraiser, and grocery clerk.  Tr. 24.

Plaintiff alleges disability during the relevant period due to chronic fatigue syndrome (CFS) and fibromyalgia.  Tr. 76.

Except when noted, Plaintiff does not challenge the ALJ's summary of the medical evidence.  After carefully reviewing the medical records, this Court adopts the ALJ's summary of the medical evidence.  *See* Tr. 21-23.

3 - OPINION AND ORDER

## STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). To meet this burden a claimant must demonstrate her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). *See also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina*, 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)). "It is more than a mere scintilla [of evidence] but less than a preponderance." *Id.* (citing *Valentine*, 574 F.3d at 690).

4 - OPINION AND ORDER

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

## **DISABILITY ANALYSIS**

### I.   **The Regulatory Sequential Evaluation**

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). *See also* 20 C.F.R. § 404.1520. Each step is potentially dispositive.

At Step One the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). *See also Keyser v.*

5 - OPINION AND ORDER

*Comm'r of Soc. Sec.*, 648 F.3d 721, 724 (9th Cir. 2011).

At Step Two the claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  *See also Keyser*, 648 F.3d at 724.

At Step Three the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(iii).  *See also Keyser*, 648 F.3d at 724.  The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 (Listed Impairments).

If the Commissioner proceeds beyond Step Three, he must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite her limitations.  20 C.F.R. § 404.1520(e).  *See also* Social Security Ruling (SSR) 96-8p.  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule."  SSR 96-8p, at *1.  In other words, the Social Security Act does not require complete incapacity to be disabled.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir. 2011)(citing *Fair v. Bowen,* 885

F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work she has done in the past.  20 C.F.R. § 404.1520(a)(4)(iv). *See also Keyser*, 648 F.3d at 724.

If the Commissioner reaches Step Five, he must determine whether the claimant is able to do any other work that exists in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  *See also Keyser*, 648 F.3d at 724-25.  Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can perform.  *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010). The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2.  If the Commissioner meets this burden, the claimant is not disabled.  20 C.F.R. § 404.1520(g)(1).

## **ALJ'S FINDINGS**

At Step One the ALJ found Plaintiff did not engage in substantial gainful activity from her January 1, 2002, amended alleged onset date through her June 30, 2007, date last insured. Tr. 16.

At Step Two the ALJ found Plaintiff had the severe

impairments of CFS and fibromyalgia.  Tr. 17.  The ALJ found
Plaintiff's impairments of ankle strain, "a disorder of the
female genital organs," depression, and anxiety were not severe
during the relevant period.  Tr. 17.

At Step Three the ALJ concluded Plaintiff's medically
determinable impairments during the relevant period did not meet
or medically equal one of the listed impairments in 20 C.F.R.
part 404, subpart P, appendix 1.  Tr. 19.  The ALJ found during
the relevant period that Plaintiff had the RFC to perform
sedentary work with the following limitations:

> [Plaintiff] could only occasionally balance,
> stoop, crouch, kneel, crawl and never climb
> ladders, ropes, or scaffolding.  [Plaintiff] was
> also unable to tolerate extreme heat, extreme
> cold, and hazards such as unprotected heights.

Tr. 19.

At Step Four the ALJ found Plaintiff could not perform her
past relevant work during the relevant period.  Tr. 24.

At Step Five the ALJ found Plaintiff could perform other
work that existed in the national economy during the relevant
period.  Tr. 25.  Accordingly, the ALJ concluded Plaintiff was
not disabled from her January 1, 2002, amended alleged onset date
through her June 30, 2007, date last insured.  Tr. 26.


## DISCUSSION

Plaintiff contends the ALJ erred when she (1) partially

rejected Plaintiff's testimony and (2) partially rejected the opinion of Paula Crone, D.O., treating physician.

## I.   The ALJ did not err when she partially rejected Plaintiff's testimony.

Plaintiff alleges the ALJ erred when she partially rejected Plaintiff's testimony.

In *Cotton v. Bowen* the Ninth Circuit established two requirements for a claimant to present credible symptom testimony:  The claimant must produce objective medical evidence of an impairment or impairments, and she must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom.  *Cotton*, 799 F.2d 1403 (9th Cir. 1986).  The claimant, however, need not produce objective medical evidence of the actual symptoms or their severity.  *Smolen*, 80 F.3d at 1284.

If the claimant satisfies the above test and there is not any affirmative evidence of malingering, the ALJ can reject the claimant's pain testimony only if he provides clear and convincing reasons for doing so.  *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007)(citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).  General assertions that the claimant's testimony is not credible are insufficient.  *Id*.  The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id*. (quoting *Lester*, 81 F.3d at 834).

Plaintiff testified at the hearing that she stopped working in 2002 because "flu-like symptoms were with [her] all the time, and [she] was . . . in bed for anywhere from 18 hours a day to all day. . . . Plus the fever was getting so bad that [she] would sweat so profusely at night that [she would] have to switch [her] sheets." Tr. 42-43. Plaintiff was also having constant pain in her arms and hips that prevented her from sleeping and made it difficult for her to "get a position comfortable." Tr. 43. Plaintiff stated she had constant pain at a level of six in her hips and seven in her arms. Plaintiff also had flu-like symptoms every day, and they were "sometimes much much worse" if she did "physical activity." Tr. 44. Plaintiff stated when she went to the grocery store, it "would trigger the symptoms where then [she would] have to come home and get back in bed and just stay in bed until [she] fe[lt] better." Tr. 45.

Plaintiff testified she usually got up between 9:30 and 10:00 a.m. during the relevant period, fed the cats and dogs if her husband was not home to do so, lied down on the couch and read, made a light meal for lunch, napped for one to three hours, ate dinner, watched television, and went to bed. Plaintiff stated she lied down on the couch because she could not sit up straight due to back and hip pain. Plaintiff was unable to cook meals, do laundry, or socialize. Plaintiff noted she could walk for about a block because walking any farther "would trigger a

10 - OPINION AND ORDER

flu-type onset, and [she] didn't want to be in bed running a fever anywhere from three days to as long as three weeks." Tr. 46.  Plaintiff stated she could lift "not more than 10 pounds" during the relevant period and she could only stand for 30-60 minutes, sit for 30 minutes, and alternate standing and sitting for 60 minutes.  Tr. 47-78.  If Plaintiff attempted to do these things for a longer period, she would "get the fever, feel like [she had] the flu, so shaky.  [Her] muscles [would] get so weak or would get so weak that [she] wouldn't be able to stand up.  It feels like your legs are jelly.  And [her] neck [was] really weak where [she] wouldn't be able to hold up [her] head." Tr. 48.  In addition, Plaintiff stated her "muscles had atrophied because [she] hadn't been doing any physical exercise."  Tr. 48.

Plaintiff noted she did not drive during the relevant period because she had "a hard time concentrating" due to her CFS. Tr. 48-49.  Specifically, one of the effects of her CFS is "mental fogginess . . . where things kind of feel blurry and foggy, and [she] ha[d] a hard time concentrating on stuff." Tr. 49.

During the relevant period Plaintiff's treating physician was Dr. Crone, who, according to Plaintiff, did not prescribe any treatment other than medication because Dr. Crone "said that chronic fatigue syndrome, they didn't have a medication or a treatment for.  And that the only treatment was to rest when you

felt tired and not to push yourself so I wouldn't get the flare

ups, to try and manage that." Tr. 51.

Plaintiff stated she worked as an event planner part-time

during the relevant period. Plaintiff testified she would not

have been able to do that job full-time because she would not

have been able to

> manage all the parts, remembering who to call, who
> to contact, and [she] just wouldn't be able to do
> that for a full-time, eight hour day. . . . [She
> would] have to be sitting up and writing things
> down. . . . [She] could make calls from the bed,
> but if [she] had to get on a computer and start
> putting stuff in, like this is who [she had]
> contacted and what time and what they're going to
> charge and all that, [she] wouldn't be able to do
> that because [she] wouldn't be able to sit that
> long or stay awake.

Tr. 55.

The ALJ found Plaintiff's "medically determinable

impairments could reasonably be expected to cause some of the

alleged symptoms," but Plaintiff's "statements concerning the

intensity, persistence and limiting effects of [her] symptoms are

not entirely consistent with the medical evidence and other

evidence in the record." Tr. 20. Specifically, the ALJ noted

the medical record contains "significant gaps in treatment"

during the relevant period and when Plaintiff "did present for

treatment during this timeframe, the objective findings . . .

[were] largely unsupportive of her . . . alleged limitations."

Tr. 20.

12 - OPINION AND ORDER

The record reflects in 2002 Plaintiff only sought medical treatment two times:  January 2002 and October 2002.  In January 2002 Plaintiff advised Dr. Crone that she was "extremely fatigued and having exacerbation of her [CFS]."  Tr. 450.  Dr. Crone prescribed Plaintiff Provigil and Wellbutrin and recommended Plaintiff to return in one month for a "recheck of Provigil." Tr. 450.  Plaintiff, however, did not seek any medical treatment until October 2002, at which time she was seen by Dr. Crone for her annual examination.  At the October 2002 visit Plaintiff did not complain of fatigue or other symptoms of CFS.  After October 2002 Plaintiff was not seen by any medical professional until she reported to Dr. Crone in January 2004, at which time Plaintiff complained of fatigue and of what Plaintiff believed to be a system-wide, chronic yeast infection.  After examining Plaintiff, however, Dr. Crone found Plaintiff's medical condition was normal.  Tr. 447.

In mid-2004 Dr. Crone referred Plaintiff to Oregon Health Sciences University (OHSU) for evaluation.  On June 15, 2004, Plaintiff reported to Richard Bryant, M.D., that she had gained 50 pounds, that she was unable to walk up two flights of stairs, and that "[i]f she walks for more than 5 minutes she will have post exertional fatigue."  Tr. 386.  Plaintiff stated she was no longer having "multiple night sweats requiring changing clothes twice nightly" and that "standing is something she does

comfortably . . . [and] it is not noticeably debilitating."
Tr. 386-87.  On examination Dr. Bryant noted Plaintiff had "13/18
American Rheumatologic Tender Points . . . for fibromyalgia and
. . . a marked tenderness over her elbows and knees."  Tr. 388.
Plaintiff, however, also had normal strength [in her extremities]
and gait and "no limitation of motion of her joints."  Tr. 388.

On July 15, 2004, Plaintiff was seen by Catherine Marie
Leclair, M.D., for evaluation of her complaints of chronic yeast
infections.  Dr. Leclair noted "[i]t is difficult to say whether
[Plaintiff] is plagued by a chronic yeast infection.  She has not
had a culture in the past with previous practitioners that
support that ongoing diagnosis.  Her wet mount today was
completely normal and her discharge looked also normal."
Tr. 384.  Dr. Leclair recommended pelvic-floor physical therapy.
She also pointed out that although therapy was not available in
eastern Oregon where Plaintiff was living, "[b]ecause she
frequents Portland on a regular basis, this does not seem to be a
. . . hardship for her."  Tr. 384-85.

Plaintiff was not seen by a medical professional again until
December 2004, at which time Dr. Bryant noted Plaintiff had
"extreme fatigue[, which is] her most bothersome symptom, and she
does have extreme fatigue after exercise."  Tr. 390.  Dr. Bryant
noted Plaintiff had "a tilt-table test ordered but has not had
that yet."  Tr. 390.  On examination Plaintiff had "12 of 18

14 - OPINION AND ORDER

American College of Rheumatology tender points" as well as

"widespread pain, most days of the week for greater than the past

3 months." Tr. 391. Plaintiff's extremities examination,

however, also was

> strong and equal throughout. Muscle tone is
> appropriate. Tremors are absent. Grip strength
> is normal. Reflexes are 2+ and equal throughout.
> Sensation is appropriate for sharp and dull.
> Coordination is normal for rapid hand, finger-
> to-nose, and knee-to-heel exams. Gait is normal
> for casual tandem toe and Trendelenburg.

Tr. 392. Dr. Bryant noted Plaintiff "did not strike [him] as

being depressed or anxious, but on questionnaire, she clearly

is." Tr. 393. Dr. Bryant, nevertheless, did not "think

[Plaintiff] need[ed] to see a psychiatrist. I do not think she

has an underlying psychiatric disorder." Tr. 392. Dr. Bryant

diagnosed Plaintiff with CFS, "her most debilitating diagnosis";

"fibromyalgia, very mild"; "questionable restless leg syndrome";

hypermobility disorder; and major depressive disorder "with

generalized anxiety and questionable PTSD." Dr. Bryant provided

Plaintiff with eight treatment recommendations: "attend the

postclinic education meeting with Dr. Loren Kim, rheumatologist";

take prescribed pain medications; try prescribed sleep

medications; consider taking an SSRI or SNRI; have a tilt-table

test, which is "the most important thing for [Plaintiff]"; begin

mental-health counseling; begin a pool or "chair-based" exercise

program "as soon as she has the tilt-table test"; consider

physical and occupational therapy; and have procain trigger point injections, for which Plaintiff is "an ideal candidate." Dr. Bryant requested Plaintiff to return to the OHSU clinic up to three times in 2005 or as needed.  The record, however, does not reflect Plaintiff followed up with Dr. Kim, that she had a tilt-table test, that she underwent counseling or physical or occupational therapy, or that she had procain injections.  In fact, Plaintiff was not seen by a medical professional again until August 2005 when she reported to Dr. Crone for her annual examination and Pap smear.

At her August 5, 2005, appointment with Dr. Crone Plaintiff reported "feeling worse from the [CFS] perspective. . . .  She has a constant cycle of fevers, fatigue and flu-like symptoms. Her joint pain flares up, especially in her hips and knees, worse when she's lying down trying to sleep."  Tr. 443.  Plaintiff told Dr. Crone that she "went to OHSU for [CFS] consult but was disappointed that they were not able to offer her anything new." Tr. 443.  This was Plaintiff's last appointment with any medical professional before her date last insured on June 30, 2007.  On August 30, 2007, Plaintiff had an appointment with a provider at Capital City Family Medicine to discuss weight gain.  Plaintiff did not discuss CFS symptoms, and her physical examination did not reflect any musculoskeletal or neurological abnormalities. Finally, substantial medical evidence relating to Plaintiff's CFS

16 - OPINION AND ORDER

appears to begin in December 2008, which is after Plaintiff's
June 30, 2007, date last insured.

The Court concludes on this record that the ALJ did not err
when she partially rejected Plaintiff's testimony regarding the
intensity, persistence, and limiting effects of her symptoms
because the ALJ provided clear and convincing reasons supported
by substantial evidence in the record for doing so.

**II.  The ALJ did not err when she partially rejected Dr. Crone's opinion.**

Plaintiff asserts the ALJ erred when she partially rejected
the January 2004 opinion of Dr. Crone, treating physician.

An ALJ may reject a treating physician's opinion when it is
inconsistent with the opinions of other treating or examining
physicians if the ALJ makes "findings setting forth specific,
legitimate reasons for doing so that are based on substantial
evidence in the record." *Thomas v. Barnhart,* 278 F.3d 947, 957
(9th Cir. 2002).  When the medical opinion of a treating
physician is uncontroverted, however, the ALJ must give "clear
and convincing reasons" for rejecting it.  *Thomas*, 278 F.3d at
957.  *See also Lester v. Chater*, 81 F.3d 821, 830-32 (9th Cir.
1996).

On January 27, 2004, Dr. Crone completed a letter in which
she stated Plaintiff "has a medical condition that prevents her
from working in any capacity.  If you have any questions please
don't hesitate to contact me."  Tr. 372.

17 - OPINION AND ORDER

The ALJ took into consideration the fact that Dr. Crone was Plaintiff's treating physician in January 2004 and gave "some weight" to Dr. Crone's opinion.  Nevertheless, the ALJ noted there are large gaps in Plaintiff's treatment before Dr. Crone offered her opinion, which suggests Plaintiff was not experiencing symptoms as severe as opined by Dr. Crone. Specifically, Plaintiff was seen by medical professionals only three times during the relevant period before Dr. Crone offered her opinion.  In addition, Dr. Crone's opinion is not supported by the medical record.  For example, on physical examination Plaintiff's findings were essentially normal.

On this record the Court concludes the ALJ did not err when she partially rejected Dr. Crone's opinion because the ALJ provided clear and convincing reasons for doing so based on substantial evidence in the record.

## **CONCLUSION**

For these reasons, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** this matter.

IT IS SO ORDERED.

DATED this 6th day of August, 2020.

                              /s/ Anna J. Brown

                              _____
                              ANNA J. BROWN
                              United States Senior District Judge

18 - OPINION AND ORDER